All right. This is Mays v. Dart, case number 20-1792. Ms. Sperry. Thank you. Judge Sykes, Judge Brennan, Judge Sinead, and may it please the court. My name is Gretchen Sperry and I'm arguing on behalf of the appellant, Sheriff Thomas Dart, today. Every day we read stories of the challenges faced by medical and public health experts in their efforts to control the coronavirus at state, local, national, global levels. These challenges are made all the more daunting in a congregate setting like the Cook County Jail, with its physical and functional limitations balanced against the operational considerations involved in ensuring security and order within the jail setting. This pandemic has demanded an urgent response to a danger never before seen in a rapidly evolving environment. As Chief Justice Roberts recently stated in South Bay United Pentecostal Church v. Newsom, it's precisely in times like these that the courts must defer to the expertise and judgment of those public officials, like the sheriff, entrusted with the responsibility to make the public health decisions and chart the proper course to ensure the safety of those in his custody. Ms. Sperry, if we were to grant your requested relief and vacate the preliminary injunction, is the sheriff completely on their own to do what they wish in response to the pandemic? If the court were to vacate the injunction order, the sheriff would continue with the comprehensive coronavirus response plan that has been in place at the jail beginning as early as January of this year. All of the, as we've seen in our briefs, all of the relief that's contained in the preliminary injunction order is largely, has already been implemented, has long been implemented within the jail itself. So to answer your question, yes. And that's at the sheriff's word, it would not be under any type of court order or injunction, is that correct? If the injunction were vacated, that's correct. But even as the district court recognized in this case, the sheriff's efforts here were, the sheriff, pardon me, the district court accepted that the sheriff was doing everything that he said that he was doing. And in fact, frequently commended the sheriff for the extensive and significant efforts that were taken to control the coronavirus on a comprehensive level. And that these actions were taken in good faith and with the goal of protecting those in his custody. Nevertheless, despite all of these findings by the district court, it ultimately concluded that somehow the sheriff's conduct was unconstitutionally inadequate. Ms. Berry, the district court left open for the sheriff to go back in and ask for additional relief if you could provide additional information. Why isn't that the appropriate remedy here? Two reasons, Judge. First, it illustrates the overarching problem with a case like this, where the district court essentially acted, appointed itself a super warden of the court to keep the sheriff within its control. By forcing the sheriff essentially to go back to the court every time there may be an issue or the circumstances change on the ground. But that isn't always the situation that the sheriff has the luxury of pursuing. For example, as we explained in our motion for stay, when the extraordinary civil unrest erupted in the city and resulted in mass arrests and many remands to the sheriff's custody, that very well could have affected the sheriff's ability to comply with the injunction order and subjected him to contempt proceedings because of the fact that the sheriff removed his discretion to operate in the moment as necessary to respond to this pandemic. It is this type of broad discretion that the chief justice recognized must be deferred to by the courts and can't be second guessed when it's the sheriff that has the expertise and judgment in making these operational decisions where the court lacks that type of background and experience. How do we draw the line? Where do we draw a line between not stepping in as super wardens and giving the sheriff the authority to do what he needs to do to effectively run the jail and protect individuals within there versus the concerns with COVID that I don't need to tell you. Everybody knows the impact of that and the potential consequences of COVID. Where's the line drawing? Well, in this case, as I said, the district court accepted the sheriff's representations that everything that he had been doing to create and implement this comprehensive coronavirus response plan was actually being done. And this was a plan that was constructed and implemented with the consultation and oversight of the Chicago Department of Public Health and the CDC representatives appointed to the CDPH and public health experts that the sheriff retained himself. And all of those were constantly being implemented and monitored over the course of several months. And as we know from the CDC report that ultimately the study that ultimately the report that was issued and attached to our reply brief, which we asked this court to take judicial notice of, it is the CDC's conclusion that it was the sheriff's early intervention and aggressive efforts to control the spread of the virus in a comprehensive way by using a multifaceted approach. And that is responsible for the success and the reduction in the spread of the virus. The CDC concluded that the number of cases in the jail peaked the week of April 5th. The complaint in this case was filed on April 3rd. So in the middle of the execution of this pandemic response, this lawsuit was filed, but the sheriff's efforts hadn't had the opportunity to play themselves out. But what we now know the benefit of the CDC's analytical report is that it was those early efforts that were responsible for controlling the spread of that virus. And that study that concluded before the injunction order ultimately was entered. If I could jump in on the legal analysis here. We have a debate at this juncture of the case on what is the proper unit of evaluation or unit of analysis for purposes of the objective unreasonableness test and whether that test is applied to each category of response that the sheriff and his staff brought to bear on the COVID problem in the jail. The social distancing aspect, the sanitation aspect, the testing aspect, and the PPE aspect, whether that's considered in its totality or whether that's taken in individual pieces. And that's sort of a fundamental legal dispute here about the proper mode of analysis. So if you could address that, please. Of course, our position of course is that this should be viewed in its totality, not only for the totality of the comprehensive actions taken in response to the coronavirus potential outbreak, but also in consideration of the other operational decisions that the court has to balance in just operating the jail on a daily basis. But more specifically to the response, and it has been this court's holding in McCann v. Ogle and also in Miranda v. County of Lake that the court consider the totality of the circumstances of the response. Putting it perhaps to illustrate a bit better, the risk of harm in this case, as alleged by plaintiffs, and I think probably accepted universally, is the risk of the spread of the infection within the jail to create a pandemic. And with the risk being as broad as it is, the analysis of the sheriff's actions taken in response to that risk should be as broad as the definition of the risk itself. It wasn't just one thing that the sheriff did in order to prevent the spread of the infection. It was the comprehensive nature of the entire response, including, as Chief Judge Sykes mentioned, everything from testing to isolation to the PPE and sanitation, as well as social distancing. Isn't it possible that one particular component of the sheriff's response is so consequential that this totality analysis that you're advocating for is inappropriate in the context of this particular risk? I think that's how I understand the plaintiff's argument here and Judge Connelly's order that social distancing, standing alone, is such a uniformly accepted remedy for COVID spread that it ought to be considered as a standalone unit of analysis for purposes of the objective reasonableness standard. Sure. I would say that there is no one element of a comprehensive response plan that is more important than others, and plaintiffs' experts also agree with that. There is no testimony, there is no evidence, no opinions that social distancing by itself is the single most important or most responsible thing for controlling the spread. In fact, the plaintiff's experts, as well as the CDC, recognize that it is the comprehensive nature, the dynamic approach to controlling the virus that is most responsible. To perhaps your concern being whether one element of a comprehensive plan could fall short in any balancing test, certainly that is a possibility. If, for example, the sheriff was executing forced six-foot social distancing throughout the jail but was doing no testing whatsoever, in that case, sure, that could tip the scales to make the entire response unreasonable because any reasonable jailor under the circumstances would be doing testing. But even in this case, looking at the efforts taken by the sheriff to implement social distancing were, in the words of the CDC in its report, unprecedented and not likely to be executed at that level by any other jail. Not only did the sheriff partner with criminal justice partners to reduce the population of the jail and release detainees and reduce the population of the jail by almost 25 percent, he opened four previously closed and now five previously closed divisions of the jail to expand the footprint of the jail, to increase the amount of single-celled housing in the jail by 33 percent. By April 17th, a week before the preliminary injunction hearing, the sheriff had increased the number of single-celled detainees by 545 percent. Nearly 3,000 of the 4,000 detainees in that jail were in single-celled housing at that point. This is not just some effort that the sheriff had made toward social distancing efforts in the housing areas. These were extraordinary actions that were taken and continued even into the common areas of the jail, where they had marked off areas where they had staggered the detainees' time out of their cells or in the common areas. They created six-foot distancing circles. They blocked off areas of tables and chairs where they couldn't be seated. They controlled access to showers and bathrooms, all in order to facilitate and maximize as much as possible these detainees' abilities to socially distance. Ms. Berry, the sheriff had asked the district court for multiple exceptions and said that they could comply with social distancing within the jail, and they were doing that with these several exceptions. The district court adopted all but two of those exceptions. In light of that, how is this objectively unreasonable? Well, first I would say that the two exceptions that the sheriff asked for were not in and of themselves so significant that it would outweigh all of the other activities that were done in order to facilitate social distancing. One of the requested exceptions was preemptive security exception, so that in the event there was a mass riot or an outbreak of a fight and there was a need to detain in an emergency nature any detainees that were involved in that kind of situation, the sheriff was requesting an exception in the event that arose, but that wasn't happening at the time. The only place there were double cell detainees at that time were within the RTU or CIRMAC facilities, which were especially accepted from the social distancing order. The other exception that the district court did not impose was the protection for protective custody detainees, and that is the one dorm that was referred to throughout the preliminary injunction hearing as well that had an 81% capacity in that dorm for those particular detainees who needed to stay together. Number one, the sheriff's decision to seek that type of an exception certainly is related to a legitimate purpose in trying to protect those detainees, but ultimately when the district court did not accept that exception, the sheriff enacted what Director Miller described as this back pocket plan to swap entire tiers of male and female detainees in order to make that possible. So that in and of itself, in our view, doesn't outweigh all of the other social distancing activities that the sheriff had implemented on balance. So if the district court modified the preliminary injunction and added those two additional exceptions that you had requested and were not given, would that be satisfactory to the sheriff? No, Your Honor. Another fundamental issue with the district court entering this order at all is that, as you note, the vast majority of that social distancing order reflects activities that the sheriff already had been doing. And by ordering the sheriff to do those things in the form of a mandatory interlocutory preliminary injunction, the district court necessarily negates this predicate finding of a constitutional violation. If this is what the sheriff had been doing, where is the constitutional violation that allows the district court to then impose the same conduct that already had been done? So on a fundamental level, the imposition of the injunction itself was improper and seeking modifications to an order that in and of itself was improper was not something that the sheriff was willing to accept under these circumstances. And I beg your pardon, I am down to three minutes and I had wanted to reserve time for rebuttal unless the panel has additional questions for me. That's fine. Thank you. Thank you, Your Honor. Ms. Grady, whenever you are ready. Thank you, Chief Judge Sykes, and may it please the court. I'd like to begin with discussing some facts that weren't mentioned thus far in the argument. At the time the district court entered the preliminary injunction on April 27th, nearly 800 detainees and staff at the jail had contracted COVID-19. Six detainees had died. The rate of infection at the jail was nearly 70% and the jail had become the largest known single source of infection in the nation. The question in this appeal is whether the district court abused its discretion on April 27th when it entered a limited preliminary injunction based on the record before it. Judge Saini, you asked about the line that must be drawn between affording a sheriff or some other jailer deference to his interest in managing the jail with the constitutional rights of the detainees. And from Plaintiff's perspective, that line is drawn exactly where Judge Kennelly drew it. He appropriately recognized that he was required to accord deference to the sheriff in his interest in managing the jail, but also simultaneously recognized as the Supreme Court held in Brown against Plata that the court must nevertheless not shrink from its responsibility to enforce the constitutional rights of all persons, including people in custody, and must not allow constitutional violations to continue simply because an inquiry into them would necessarily require inquiry into the operation of the jail. And we know that Judge Kennelly didn't just pay lip service to the deference that he accorded to the sheriff's interest because he crafted a very narrow preliminary injunction that was based on the discretion that he was affording the sheriff. It included exceptions that the sheriff had asked the district court to provide. And it invited, as Judge Saini, you indicated, he invited the sheriff to return if there were some legitimate basis for including or expanding the number of exceptions. The sheriff chose not to take him up on that offer and to date has offered no explanation or indication as to why those need to be indicated. To the contrary, his submission that he was able to immediately comply with the terms of the preliminary injunction suggests the opposite. Ms. Grady, what changed in terms of the facts between the TRO and the preliminary injunction? Because in the TRO, the district court declined to impose the social distancing requirement and said that they were in compliance with the CDC guidelines, or effectively and essentially in compliance with them, and declined. And then at the preliminary injunction, he imposed these social distancing requirements, dropped a footnote in the order that he had a more fully developed record. But on the facts, it seems like a lot more social distancing had been accomplished at the jail from the time of the TRO to the time of the preliminary injunction, which would cut against requiring more social distancing. So I think two things changed. Certainly there was the addition of expert testimony from plaintiffs about the necessity of social distancing. Dr. Mohareb, an infectious disease specialist at Harvard, for example, submitted a report that talked about social distancing as being necessary, and that the other measures that were the subject of the TRO were also necessary but not sufficient without social distancing. So I do think that there was a more expansive record that the district court appropriately took into account in determining plaintiffs' requests. But in addition to that, the record at the evidentiary hearing made clear that the sheriff was deliberately choosing not to provide housing for socially distanced— I'm sorry, let me try that again. At the evidentiary hearing, the evidence demonstrated that the sheriff was deliberately choosing not to house detainees at risk of sexual assault and detainees he considered disorderly in a way that they could socially distance. That was a deliberate decision. It was unexplained, as the district court found. And the district court, therefore, determined that that was objectively unreasonable. He did so after acknowledging the steps that the sheriff had taken. But I think it's also critical to note the steps the sheriff took occurred after the initiation of the lawsuit, and that's relevant as well. At the time plaintiffs filed their complaint, more than half of the detainees at the jail were housed in a setting that didn't permit social distancing. They were in tiers above 50%. They were double-celled. And at the time of the TRO, the district court declined— I don't believe that the district court found that the sheriff had complied with CDC guidelines, but he found that the sheriff was continuing to increase social distancing. But by the time of the evidentiary hearing at the preliminary injunction, it was clear that the decision had been made by the sheriff not to socially distance detainees at risk of sexual assault and detainees he considered disorderly. And the evidence in the record that was undisputed by the sheriff established that permitting those folks to get distance in terms of their housing situation was necessary, and the sheriff's decision not to do that was objectively unreasonable. Does the fact that the sheriff continued to implement social distancing measures after the TRO, when the court declined to enter a TRO on that, cut against your argument that a lot of these things were not put in place until after you filed the lawsuit? So in other words, the court did not mandate them, but the sheriff nonetheless continued to move people into single cells, to reduce the numbers in the dormitories, to—there were numerous inmates who were released. All of that continued to happen after the TRO, even though they weren't under a mandate to do it. So the answer is no, and the reason is because the district court declined to issue in the temporary restraining order a mandate for social distancing and housing because the sheriff was continuing to do so. So I think that told the sheriff that the only way to avoid having that included was to continue making that progress. And the record demonstrates at various hearings that the district court asked repeatedly the sheriff about the feasibility for additional social distancing. That, plus our evidence, which continued to establish as we submitted our renewed motion for the preliminary injunction, the evidence established its necessity. I don't think it's wholly irrelevant, but I certainly don't think it has—it cuts against the district court's ability to have issued that within its discretion. Ms. Brady, there's a couple of other appellate courts that have grappled with this this summer, the Swain case, the Eleventh Circuit, the Wilson case, the Sixth Circuit. Is your argument that those cases differ from here because those involve district court preliminary injunctions that were much broader than Judge Kennelly's? Or how do you—how should we reconcile the request that's being made with decisions like Swain and Williams? So I think that there are a couple of differences. Of course, in those cases, they were two-to-one decisions. But Swain dealt with a case that was adjudicated on a deliberate indifference standard where the district court had fully credited all of the sheriff's evidence. Williams dealt with a preliminary injunction that was ordering release of detainees, which is not the case here. That request from the plaintiffs in this case was denied. And the Swain case and the Cameron case involved, as Judge Brennan, as you mentioned, involved preliminary injunctions that were far broader and accorded far less deference to the jailer or prison official who was at issue. In Cameron, for example, the preliminary injunction included a mandate that the jail—I believe, actually, yes, it was a jail. I'm sorry. Included a mandate that the jail respond to all emergency requests for medical care within an hour. It mandated social distancing, as did the preliminary injunction in Swain, without exceptions throughout the facility. Here, we're dealing with a preliminary injunction that was far more narrow, repeatedly, and in the terms of the preliminary injunction itself, accorded far more deference to the sheriff, and also dealt with an objective reasonableness standard. I think, given those differences, those cases are easily distinguishable, and especially in a case like this one, where the court is reviewing the entrance of a preliminary injunction on abusive discretion, given the evidentiary record, its undisputed nature, and the fact that the sheriff all but concedes that the measures at issue are, in fact, necessary as a public health matter. This case is far different from those. Ms. Grady, earlier— If I could just jump in and correct a statement about the standard of review. The standard of review for purposes of the likelihood of success on the merits is a de novo standard. The balancing of harms, et cetera, is an abuse of discretion, and then the crafting of the components of the injunction, that exercise of discretion is for abuse of discretion more deferentially, but the likelihood of success on the merits and the application of the objective reasonableness standard is a de novo standard. Yes, thank you, Judge Sykes. I apologize for insinuating anything to the contrary. I think what I was articulating there was that in Swain, for example, the Eleventh Circuit hinged its legal analysis on two things. One was that the district court had failed to hold the sheriff to a standard of subjective deliberate indifference and had conflated an objective prong with the subjective requirement. So in that sense, it's inapplicable to this case where the objective reasonableness inquiry is the inquiry here. And then it also discussed the need for deference to the sheriff, and so it's on that score that this court in Mays, Judge Kennelly did accord that deference, as we can see both from his opinions and also from the terms of the injunction itself, and that decision is reviewed for an abuse of discretion. Ms. Grady, one more question before you move on. Earlier this month, the Supreme Court in Barnes v. Almond granted the sheriff's request for the stay of a preliminary injunction that required the sheriff to implement certain COVID procedures. Should we read anything into that? No, Your Honor. In Cook County v. Wolfe, this court held that the fact that the Supreme Court has issued a stay must not be read as a sub salentio disposition of the underlying dispute, lest there be no merits adjudication at all. And that preliminary injunction in Almond was actually pretty much the same as the preliminary injunction in Cameron. It involved far broader terms, including social distancing throughout the jail without exception. The same sort of emergency request for medical care must be responded to within the hour. Given that the decision in Barnes, which was 5-4, but given that it was not explained, I don't think that this court can rely on that or read anything into that other than that the Supreme Court did a balancing analysis with respect to how to treat the preliminary injunction while the case is proceeding through the courts of appeals. I'd like to turn to an argument my colleague on the other side made about the fact that the sheriff had been doing the actions that were at issue in the case before the injunction. I think that the record very clearly disputes that. The sheriff's own evidence demonstrates that before the temporary restraining order, there was no policy that permitted sufficient soap for detainees to wash their hands. The COVID plan itself only advised detainees to perform frequent hand hygiene when they were symptomatic. That's at record 40-1 at 11. It was undisputed that masks were not being provided to expose detainees. That's at record 30-7 at 6. There was no policy. The sheriff had no policy for testing. The staff reported that the use of crowded bullpens continued, and the sheriff did not dispute that. And the record remained at the time of the preliminary injunction hearing as the district court expressly found that the decision had been made not to socially distance certain groups of detainees, despite the fact that it was feasible for the sheriff to do so. One of the things, Judge Sykes, that you mentioned during a colloquy with Miss Ferry was about the legal mode of analysis and how this court should focus its objective reasonableness inquiry. I think the answer is that both are true. All of the things, all of the circumstances that go into how the sheriff responded to the COVID-19 outbreak at the jail are relevant, but they don't all have the same relevance. And this court has repeatedly found that under a totality of the circumstances inquiry, some things have more relevance than others, including a change in circumstances, which may change the objective reasonableness of the conduct. And even in the deliberate indifference standard, as this court has articulated in petties against Carter, continuing to persist in conduct, despite knowing it is ineffective, can establish an Eighth Amendment violation. In this case, the testimony from plaintiff's experts was focused on certain public health measures, and those measures were not being taken by the sheriff. So while the sheriff's conduct in January had some relevance in the district court, Judge Connelly addressed those actions. That was not dispositive on the question of his objective reasonableness with respect to denying detainees masks, with respect to denying detainees sufficient soap to clean their hands, with respect to denying certain groups of detainees the ability to be housed in an area that permits social distancing with their housing arrangements. The district court was permitted to take those things into account and understand, given all of the evidence in the record, including plaintiff's expert testimony, that the sheriff was objectively unreasonable in taking certain actions, even though, as the district court acknowledged, the sheriff had taken other actions and was not responding to the COVID-19 outbreak in bad faith. That was a correct analysis and one that this court should affirm. Finally, I'd like to address the CDC report that Ms. Sperry alluded to. This court previously denied the sheriff's motion to supplement with that report, but I just want to make clear that there is no basis for this court to take judicial notice of that report. Federal Rule of Evidence 201 discusses when a court can take judicial notice of something that was not before the district court, and establishes that it can only when it involves a fact that's not subject to reasonable dispute because, among other things, the accuracy of the source cannot reasonably be questioned. Here we have no evidence in the record and no indication from the sheriff why he contends that report is from the CDC. To the contrary, it appears that the report was authored primarily by sheriff's employees, and certainly there are many contentions in that report that we contest. The appropriate place to raise that report and raise the arguments about the sheriff's compliance and his contention that he will continue to do this, notwithstanding anything else, those are all appropriately raised to the district court by way of a motion for modification or termination of the preliminary injunction. The district court, in this case, Judge Connelly expressly invited the sheriff to come and bring more evidence, bring additional explanation, if the terms of the preliminary injunction were incompatible with the sheriff's legitimate interest in managing the jail. The sheriff opted not to do that and instead has tried to insert those arguments to this court on the first instance, but that's not appropriate as a matter of appellate procedure. In conclusion, the district court thoroughly analyzed the evidence, dutifully applied Supreme Court and Seventh Circuit precedents regarding the constitutional issues presented, and appropriately recognized its simultaneous role to accord deference to the sheriff in managing the jail and its own responsibility to enforce the Constitution. In the end, the district court determined that the evidence established that a narrow set of additional public health measures was necessary to combat the imminent threat to the health and safety of plaintiffs at the jail. That decision was not an abuse of discretion and this court should affirm the district court. If there are no further questions, I am happy to yield my time. Thank you. Ms. Ferry, rebuttal. There's a few quick points on rebuttal. First, as to Judge St. Eve's question, social distancing was not issued, ordered in the TRO because the district court found that the CDC did not require it. There was no additional evidence presented at the preliminary injunction hearing that changed that. The plaintiff's expert, Dr. Venters, agreed that the CDC guidelines were the appropriate standard to follow. He did not provide any testimony to suggest that social distancing in and of itself, above all else, was the linchpin of any response to the coronavirus. Nor did he provide any suggestion for how the sheriff's conduct could have been more reasonable under the circumstances. His primary opinion was that the sheriff should invite more officers in to enforce social distancing within the common areas of the jail. But he did nothing to solidify this notion that the sheriff's conduct was unreasonable because he had to implement these structural and functional modifications that the CDC guidelines acknowledge. And which, of course, were crafted with the consultation of public health experts as the CDC guidance permits. To Judge Brennan's question, the cases of Swain and Wilson and Cameron are extremely instructive in this case. What the court is trying to determine here is what is the reasonable response to a never-before-seen global pandemic within the confines of a jail. And while those particular cases might have been decided under deliberate and different standards, they're instructive here because it gives a sense of what a reasonable sheriff, under these circumstances, with the same knowledge that the sheriff had in this case and what they had done. And in each one of those cases, Wilson, Cameron, and Swain, they had implemented all of the same activities that the sheriff had with control of people coming into the jail, screening at intake, quarantine in isolation, enhanced cleaning protocols, providing masks. But in addition to all of that, the sheriff also was quarantining detainees at intake before they entered the general population. They were one of the first places in the nation to implement rapid testing. Of course, all of the social distancing, extraordinary social distancing efforts that I detailed earlier. All of those things were done on top of these other efforts that the 6th and 11th circuits deemed to be reasonable by looking not at what those wardens hadn't done, but by looking at the conduct that they had taken. And if those are reasonable standards, the sheriff here has exceeded those. And I see I am out of time, unless the panel has any further questions. All right. Thanks to both counsel. The case is taken under advisement. Thank you very much, Judge. Thank you very much.